On the Merits.
LAND, J.
The pleadings and issues in this case are set forth in Succession of Drysdale, 121 La. 816, 46 South. 873, and need not be repeated. The cause was nonsuited for the purpose of giving the executors an opportunity to probate the alleged original will of Mrs. Drysdale in the court below.
In July, 1908, the executors produced said alleged original will, and, after notice to the heirs at law, proceeded to probate the same. After hearing the evidence and argument, the judge took the matter under advisement, and on July 31, 1908, rendered judg-’ ment refusing to probate the alleged will because in his opinion the document as a whole was not sufficiently proven. The executors have appealed.
We make the following extracts from the opinion of the judge a quo, viz.:
“The original will consists of three typewritten sheets of paper. The first two sheets contain the caption and various bequests, among them *259 a legacy, at the top of the second page, to Janet Carpenter, wife of Thomas H. P. Carpenter, of $4,000, and to each of her children as follows: To Julia, $1,500 and her diamond ear-drops, breastpins, and diamond and emerald rings; to Drysdale, $500 ; to Elsdon, $500 and the late Andrew Drysdale’s watch and bank box; to Frank, $500, and watch and chain in bank box. Later down on the page is a legacy to Thomas II. P. Carpenter of the balance of her estate, whatever it may be, after all expenses have been paid, for his services to the deceased and her late husband while living; these legacies constituting the greater part of her estate. The last sheet contains five lines, in which the testatrix names the executors and states she signs her name. It also contains 11 half lines of typewriting, stating she declared this her last will and testament in the presence of the witnesses, and at her request they all signed their names. The last sheet is signed ‘Julia P. Drysdale, W. H. Magill, A. E. Jones,’
“It appears in substance from Mr. Magill’s testimony that while he was at work in Mr. Carpenter’s house, in Minona, in the province of Ontario, Canada, Mrs. Drysdale came in and asked him to witness her will. She said she needed two witnesses. He stepped to the door and called Mr. A. E. Jones, who was in another room in the office also working for Mr. Carpenter ; that Jones came in; that Mrs. Drys-dale produced two or three, perhaps four, sheets of typewriting fastened together at one end with a brad or paper fastener, and said it was her will; that she. walked to a high desk and signed it; that he then signed the last page just below her signature, and Jones then signed below him; that he did not read the will attentively — just scanned it; Mrs. Drysdale did not mention its contents; that he did not remember its contents; that he could not in any way identify the two first pages as the same two pages annexed to the page he signed; that he could only identify the last page, because his signature was placed thereon; that, after they had all signed, Mrs. Drysdale left the office, talcing the will with her; that after she left he told Jones that they had better not say anything about it, and that he never mentioned it; that after Mrs. Drysdale’s death he was told by Mrs. Carpenter that he had witnessed a will. Mr. A. E. Jones in substance tells the same story. lie says, however, that he did not read the will, and could- only identify the last page because his signature was appended thereto. - “Mrs. Drysdale died in August, 1905. Mr. Carpenter came to New Orleans, and inquired if there was a will here. 1-Ie tried also to settle up the estate with her heirs. While here, on November 5, 1905, he telegraphed his lawyer, S. F. Washington, in Hamilton, Ontario, Canada, to secure affidavit from his (Carpenter’s) wife to examine package in office of Harrison & Lewis and report contents by wire. On November 6th, Washington wired Carpenter that he had found will in office of Harrison & Lewis, and that he and McCloskey were executors.
“On the same day Carpenter wired Harrison & Lewis to send will to this city, which was done. Carpenter received here the original will, and took it from here to Canada for probate. There is no positive evidence of what became of the will or where it was from the time it was signed in September, 3903, in Carpenter’s office, until it was found in November, 1905, in the office of Harrison & Lewis.
“Mr. Harrison’s testimony was taken by commission, and he says: ‘I cannot say I was acquainted with Julia P. Drysdale. I think she was introduced to me in the office of Teelzel, Harrison & Lewis or Teetzel, Harrison & Mc-Brane. _ There was what purports to be her will found in my office, on inquiries made by Mr. Washington and Mrs. Carpenter. It was taken from the vault by my clerk at my request, on inquiry from Mr. Washington and Mrs. Carpenter. I cannot say that I lodged it there, or who did. I am not sure that she (Mrs. Drysdale) was a client of mine. She may have been a client of Mr. Teetzel’s, but she was not at all events a personal client of mine.’ Mr. Teetzel’s testimony has not been taken.
“On the 2d day of January, 1906, the will was presented for a probate by Judge J. F. Monde,_ acting surrogate judge, in the surrogate court, in the county of Nonworth, province of Ontario, Canada. It was presented by and probated on the application of the executors.
“It appears from the testimony of Judge Monek that a tj'pewritten will is valid by Canadian law if signed by the testator in the presence of two witnesses present at the time and who sign as witnesses in the presence of the testator and each other; that he probated the will in question on the affidavit of W. II. Ma-gill, dated December 11, 1905, and A. E. Jones, dated December 33, 1905, both affidavits made before J. II. Crenor, notary public in the' province of Ontario, Canada, and that it is the practice in Canada to probate wills on the affidavits of witnesses.
“Magill and Jones in their affidavit state: ‘That I am one of the witnesses named in the paper writing now hereunto annexed, purporting to be and contain the last will and testament of Julia Pike Drysdale, late of New Orleans, in the state of Louisiana,' widow, deceased, who died on or about the 19 th day of August, Anno Domini 1905, at New Orleans, and who had at the time of her death a fixed place of abode at New Orleans, in the state of Louisiana, the said will bearing date-the 14th day of September, Anno Domini 1903, beginning thus: “This is the last will and testament of me, Julia Pike Drysdale of the City of New Orleans,” ending thus: “In witness» thereof I have hereunto set my hand the day and year first above written,” and being subscribed thus: “Julia P. Drysdale,” and having viewed and perused the said will, and particularly observed that there are no additions, alterations, or interlineations in said will,. I, the said William I-Ienry Magill (and Alva Edgar Jones), make oath that the same is now *261 in all respects in the same state, plight, and condition as when the said will was executed by said testatrix.’ * * *
“The evidence of Magill and Jones contradict their affidavit,_ and show that what they swore to is not strictly true. It is true that they signed the last sheet of the will, and that Mrs. Drysdale signed it. It is not true that they identify the first two pages or the whole document as the will she signed. Magill could not, although he scanned it, and Jones could not, because he even did not read it. Their affidavits were made on hearsay evidence, and what they believed, but did not know, to be true.”
The trial judge held that the three typewritten sheets had not been proved "to be the will of Mrs. Drysdale under the rules of evidence applicable to the probate of wills in this state, and points out that articles 1G4S and 1649 of the Revised Civil Code require the witnesses to swear that they'recognize the testament presented to them as being the same that was signed by the testator in their presence. Continuing the judge said:
“The two witnesses, Magill and Jones, failed to make the proof required by these articles. They have proved only the last page.
• “Considering that the sheets of paper presented to the witnesses and declared by the testatrix to be her last will were fastened together at one end with a brad, could be easily separated, and other pages substituted before the last page without altering the sense of the will or the substitution being detected from reading the will; considering, further, the length of. time between the signing of the will and its being found at the suggestion of Carpenter, one of the executors and the residuary legatee, and his wife, the principal legatee, neither of whom are the heirs of the deceased; that during said time no evidence is'produced to show where the will was, nor any evidence produced to show when or how the will came to be in or by whom placed in the office of Harrison & Lewis; considering, further, the acts and conduct of Carpenter as disclosed in the record, and his failure to testify herein; considering the facts, together with the absolute failure of the two witnesses to identify and approve the papers presented to be the last will of the testatrix; and considering, further, that it ought to be by very strong and conclusive proof made before this court before it receives and probates a will disbarring and disinheriting practically the legal heirs of the deceased, her brother and sister, and giving her property to a stepdaughter and her husband — the court rejects the pretended will, declines to probate it, and from all the evidence declares that the deceased died without a will, and that Mary Ann Pike and John Thomas Pike are her legal heirs, and entitled to be put in possession of her estate. * * * ”
The judge a quo admits that the last page of the will was sufficiently proven by the testimony of the two subscribing witnesses. This last page was, at the time it was signed, attached to two other pages, the whole constituting the last will and testament of the decedent, in which the testatrix nominated Bernard McCloskey and T. H. Carpenter as joint executors. Mrs. Drysdale retained possession of the instrument. In November, 1905, this same last page was found in a safe in the office of Harrison & Lewis, attached to two other pages of typewritten matter, the whole constituting a coherent testament, containing a large number of particular legacies. After directing the payment of her debts, the testatrix bequeathed to her sister, Mary Ann Pike, $4,000, also all her household furniture, etc., and cluster diamond ring. The next bequest was one of $2,500 to John Thomas Pike, the brother of the testatrix, followed by bequests of $100 to each of his four children by names. These bequests to the contestants herein were about 25 per cent, of the inventoried value of the estate. Other bequests were made to friends, relatives, and connections, aggregating $6,000. Then follow the legacies to Mrs. Carpenter and children, amounting in all to $7,000. The last special legacy was to her old colored servant, Francis Duplantier. The testatrix left $200 for the purpose of maintaining her tomb, wherein she desired to be buried by the side of her deceased husband, in Hamilton, Canada. The numerous special legacies are of such a nature that it is most improbable that they were the work of a forger. For instance, the jewelry of the testatrix is specifically described and distributed among several legatees, and the watch of her deceased husband is given to one of his grandchildren and his chain to another, both articles being described as in the bank box of the testatrix. Special lega *263 cíes are made to 1G children by name. It is not suggested that the will contains a single error as to names, articles, or facts. The residue of her estate was bequeathed to T. H. P. Carpenter for services to her and her late husband when living. The total inventory of Mrs. Drysdale’s estate was $28,-423.2G. The total special bequests in money amount to $20,200. What the residuum of the estate will be does not appear. Mrs. Carpenter was the stepdaughter of Mrs. Drysdale, who had no children of her own. Mrs. Drysdale spent her summers at the home of the Carpenters in Canada, and her relations with them were very intimate. The will presented for probate was not drafted in the sole interest of the Carpenters, as about one-half of the gross estate of the testatrix was bequeathed to other persons. The internal evidence points to Mrs. Drysdale as the maker of the testament. It is hardly possible that any third person could have been the author of an instrument showing such knowledge of the articles of jewelry owned by Mrs. Drysdale and the particular box in which her deceased husband’s watch and chain were kept. A forger would hardly have thought of such details, or have distributed the estate among so many legatees.
The testament as presented was taken with other papers from a large folding envelope, worn by use, found in the office safe of Harrison & Lewis. On the back of this envelope appears the word “Drysdale,” apparently in the handwriting of the deceased. The other papers consisted of an old bank passbook in the name of Mrs. Drysdale, 13 checks drawn by Mrs. Drysdale on the same bank, and a deed of date January 9, 1892, signed by Mrs. Drysdale, containing an agreement to purchase lots in Winona Park, with two letters of attorney of same date from Mrs. Drysdale to Carpenter attached thereto. .
All the acts and declarations of Carpenter soon after the death of Mrs. Drysdale tend to show that he did not know of the existence of this will. It was not until November 5, 19C5, that he appears to have been informed that there was a package of Mrs. Drysdale’s papers in the office of Harrison & Lewis.
The first contention of the opponents was that the signature of Mrs. Drysdale to the will was a forgery. Their contention now is that the two first sheets are forgeries, or at least have not been proved to be genuine. There is no evidence to support the charge of forgery. The asserted suspicious circumstances relate to the failure of Carpenter to testify, and to his personal acts and conduct. Carpenter had nothing to do with the confection of the will, and his acts of commission or omission cannot affect the question, unless it be shown that the will has been tampered with by some one. The assertion that Carpenter had possession of the passbook which was found with thé will in the same envelope rests on the testimony of Miss Pike to the effect that Mrs. Drysdale told her that the book was turned over to Carpenter in the settlement of Andrew Drysdale’s estate. The passbook in the record is in the individual name of Mrs. Drysdale, and covers the period from June 17, 1892, to August 27, 1896. Andrew Drys-dale died in 1896. Carpenter was the “adjuster” of the estate, and settled his accounts with Mrs. Drysdale in May, 1897. Prom the statement rendered by Carpenter, it appears that Andrew Drysdale had a passbook in the same bank. As far as the statement shows, Mrs. Drysdale’s personal passbook had nothing to do with the settlement of the estate. Pier husband’s passbook was probably turned over to Carpenter, who was administering the estate. Miss Pike or Mrs. Drysdale may have confused the two passbooks. Be this as it may, testimony as to the declara *265 tions of a dead person is the weakest of all evidence and the worst kind of hearsay, and is utterly insufficient to establish any fact against a third person.
The same statement shows that J. V. Teetzel of Ontario, was the solicitor for the estate of Andrew Drysdale in Canada, and was paid a fee. It was in the office occupied or formerly occupied by Harrison & Teetzel that the envelope containing the will and other documents belonging to Mrs. Drysdale was found. It may be here stated, for what it is worth, that Judge Monek, who probated the will in Canada, testified that Harrison & Teetzel said that they were attorneys for Mrs. Drysdale. It appears that Teetzel is on the bench. His deposition was not taken on either side.
The facts are that Mrs. Drysdale made a will, and soon after her death a will signed by her and the same witnesses and of the same date was found in the law office of a solicitor who had represented the estate of her husband. The testament has been positively identified as to the last sheet, on which appear the nomination of the executors and the signatures of the testatrix and the witnesses. In the absence of evidence, what is the legal presumption as to the other sheets?
In Am. & Eng. Ency. Law (2d Ed.) p. 603, the rule at common law is thus stated:
“As a general rule, the witnesses need not at'test every sheet of a will, nor is it necessary that every sheet should be shown to them. It is sufficient that all the sheets were in the room at the time of execution and attestation, and, in the absence of proof to the contrary, such is the presumption. Sheets which are bound together and constitute the will at the testator’s death are presumed to have been bound together at the time of the attestation.”
Gardner on Wills, p. 36, says:
“Where papers are found fastened together after the death of the testator, coherent and in their natural order and containing a will, there is a presumption that they were in this condition when the will was executed.”
While we have no cases in our State Reports on this subject, it seems to us that the above rule is founded in common sense. Otherwise, the parties and the witnesses would be required to sign or attest each folio of every written instrument evidencing a will or agreement. It is more reasonable to presume that the document presented is the same that the testatrix executed than to suppose that some one has committed a felony by abstracting certain sheets and substituting others. Wrongdoing cannot be proved by mere suspicious circumstances.
Mrs. Drysdale made a will in September, 1903. All the known facts of the case tend to prove that she deposited this testament in the office of Harrison & Teetzel. Mrs. Drys-dale died believing that she had left a last will and testament. A few days before her death, Miss Pike called on Mr. MeCloskey and inquired if he had a will. When he gave a negative answer, Miss Pike seemed surprised, and said that Mrs. Drysdale had led her to believe that Mr. MeCloskey had her will.
It is shown beyond question that the will is perfectly valid under the laws of Canada, and that the evidence here adduced is sufficient to probate it in that jurisdiction.
By the laws of Louisiana, the will, if it had been executed here, would be void for want of form, in that it has not the necessary number of witnesses, and was not read at the time in a loud, audible voice. It is impossible, therefore, for the will to be proved in the state of Louisiana as is required in the case of local wills.
Our former decision, reserving the right of the executors to present the original will for probate in this state, assumed that it could be probated here if all the formalities required by the laws of Canada had been observed in its confection. In Succession of Hall, 28 La. Ann. 57, it was held, first, that a foreign will could be probated in the. state of Louisiana, and, second, that, if valid ac *267 cording to laws of the place of its execution, it will be valid in this state. The cases cited here by appellee’s counsel, to wit, Robert v. Allier’s Agent, 17 La. 17, and Succession of Robert, 2 Rob. 427, were considered and disposed of in Succession of Hall, supra, 28 La. Ann. 59, 60.
The question of the identity of the folios constituting the instrument as a whole is one to be solved by the rules of evidence. The trial judge erred in not applying the presumption of identity which we have already discussed, and in holding that it was essential that each particular folio should be positively identified by the witnesses.
In’ our opinion, the will was sufficiently proven by the evidence in the record.
The question whether a decree of probate in this case will conclude the opponents from hereafter attacking the will by direct action is prematurely raised, and need not be considered.
It is therefore ordered that the judgment appealed from be reversed, and it is now ordered that the document of date September 14, 1903, presented and filed below as the last will and testament of Mrs. Julia Pike Drys-dale, be recognized as such, and recorded and executed according to its tenor; and it is further ordered that the executors nominated in said testament be confirmed, and that letters issue to each of them on his qualifying according to law; costs below to be paid by the succession, and costs of appeal by the appellees, heirs at law.